**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| **ARIEL PREFERRED RETAIL GROUP, LLC., ET. AL.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **vs.** ) | **Case No. 4:10CV623SNLJ** |
| ) | |
| **CWCAPITAL ASSET MANAGEMENT, ET. AL.,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM

Plaintiffs have filed this multicount lawsuit against the defendants arising out of the alleged termination of the plaintiffs as manager(s) of certain financially distressed premium retail outlet malls.  Upon the Court's order, seven (7) claims against the defendants remain pending: Count I - Trademark Infringement (15 U.S.C. §1114); Count II - False Designation of Origin and Unfair Competition under Section 43(a) of the Lanham Act, 15 U.S.C §1125(a); Count III - Common Law Trademark Infringement; Count IV - Trademark Infringement (§§417.061, 417.066 R.S.Mo.); Count V - Breach of Contract; Count VI - Unjust Enrichment; and Count VIII - Unfair Competition.[1]  This matter is before the Court on the defendants' motion for summary judgment [59 and 60], filed October 28, 2011.  Extensive responsive pleadings have now all been filed and this matte is ripe for disposition.  This cause of action is set for jury trial on the Court's docket of September 24, 2012.

The appropriate standard for consideration of all motions for summary judgment is as follows:

> Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  The movant bears the initial responsibility of informing the district court of the basis for its motion, and must identify those portions of the record which it

---

[1]Court Order [55 and 56] dismissing Count VII - Tortious Interference and Count IX - Fraud from plaintiffs' amended complaint [20].

believes demonstrate the absence of a genuine issue of material fact. If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial.  On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.  Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.  The nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial.  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.

Torgerson v. City of Rochester, 643 F.3d. 1081, 1085 (8th Cir. June 1, 2011)( internal citations and quotations omitted); *see also*, Jackson v. United Parcel Service, Inc., 643 F.3d. 1031, 1042 (8th Cir. 2011)(*citing* Torgerson*, supra.*).

The Court has carefully reviewed this lawsuit, including but not limited to, the defendants' statement of uncontroverted material facts [61], the plaintiffs' objections thereto [72], and the defendants' reply to the plaintiffs' objections [81], and finds that most, if not all, of the material facts have been admitted or plaintiffs have failed to properly deny the noted fact.[2]  In numerous instances, the plaintiffs have circumvented the noted fact with irrelevant narrative, a legal conclusion, no citation to the record to support the denial, and/or the citation to the record fails to controvert the fact as stated.[3]  The following recitation is the Court's findings of fact based on the record before it.[4]

Plaintiff Prescott Group, LLC (Prescott) is a Delaware limited liability company with its principal place of business in New York, New York.  It operates as a real estate investment and asset management firm active in structuring commercial real estate investments on behalf of both

---

[2]*See*, Local Rule 4.01(E).

[3]*See e.g.*, Defendants' Material Facts and Objections: 4, 10, 20, 31, 39, 40, 43, 45, 46, 48, 53, 55, 56, 58, 61, 65, 71, 72, 85, 86, 88, 89, 91-95, 114, 116, and 131.

[4]Where considered necessary, and for clarity, the Court will refer to specific exhibits filed by the parties.  In some instances, the parties have filed duplicate exhibits, and in such instances, the Court will cite to a single exhibit for purposes of judicial economy and clarity.  However, the Court's choice of the cited exhibit in no way indicates any preference or bias on the part of the Court.

institutional and private client investors.  Prescott undertakes investment banking and advising in real estate ventures.  Prescott's clients consist of institutional investors and high net worth investors.

Prescott is the parent of several affiliates owned by Prescott, including Prescott Capital Management, Prescott Capital Advisors, Prescott Administrative Services, and Ariel Preferred Retail Group.

Prescott is the registered owner of the trademarks (Ariel Trademarks) at issue in this cause of action.

Plaintiff Ariel Preferred Retail Group, LLC (Ariel) was formed in 2005 and is a wholly-owned subsidiary of Prescott Capital Management, LLC. It is headquartered in Williamsburg, Virginia with its own management staff and employees.

Ms. Susan Stupin is a co-founder and Managing Director of plaintiff Prescott, with offices in New York, New York.  She also sits on the Board of Directors of plaintiff Ariel. Ms. Stupin is a graduate of Princeton University and the Harvard Business School.  Prior to co-founding Prescott, Ms. Stupin had substantial experience in real estate, investment banking, and capital markets.

Mr. Theodore R. Gamble, Jr. is also a co-founder and Managing Partner of plaintiff Prescott, with offices in New York, New York.  Gamble also sits on the Board of Directors of plaintiff Ariel.  Gamble is a graduate of Princeton University and the Harvard Business School. Gamble has been working on complex business transactions for the past twenty-five (25) to thirty (30) years.

Mr. Don Chapman, during the relevant time-period, was a managing director and board member of Ariel.

Defendant CWCapital Asset Management (CW) is a limited liability company with its principal place of business in Needham, Massachusetts.  CW, is in part, in the special servicing industry, and was the Special Servicer for the defaulted loans at issue in this case.

Mr. Jim DeAngelo is an asset manager for CW.  DeAngelo was the asset manager in charge of the subject outlet malls from approximately April 2009, when Borrowers defaulted on

3

its loan, to approximately December 2009, when a Receiver was appointed by a state court in Georgia.

Mr. Alex Rivero was, until approximately March 2011, as associate asset manager at CW.

Mr. Burr Ault is an asset manager for CW.  He was responsible for the Ariel properties from approximately December 2009 to the present.

Defendant The Woodmont Co. (Woodmont) is a Texas corporation with a principal place of business in Fort Worth, Texas.  Woodmont is in the business of property management and asset services for commercial real estate.  This includes, but not limited to, operating and/or leasing third-party properties for third-parties.

Defendant Frederick J. Meno is the President and Chief Operating Officer of Asset Services at Woodmont.  Mr. Meno is a Certified Property Manager, RPA and CSM.  Prior to joining Woodmont in his present capacity, Mr. Meno was a Senior Vice-President of Operations, Management, and Construction Management at Prime Retail LP, one of the largest developers and operators of outlet shopping centers in the country.

On December 11, 2009 Mr. Meno was appointed Receiver of the six subject Ariel properties (a/k/a as the Properties or the Assets) by the Gwinnett County Superior Court, State of Georgia.  Mr. Meno had prior experience as an appointed Receiver on other properties not connected to the subject Properties.

Mr. Brian Restivo is an attorney and the Assistant General Counsel at Woodmont.

Between 2005 and 2006, in addition to forming Ariel, Prescott Capital Management LLC, an affiliate of plaintiff Prescott, joined with several other investment partners to form First Value Retail Holdings LLC[5] (FVRH).  FVRH formed single purpose LLCs (the Borrower) to acquire

---

[5]In their response to the plaintiffs' Statement of Uncontroverted Material Facts [72], the plaintiffs repeatedly use the anagram "LLP" in reference to FVRH and/or the Borrowers; however, in Ms. Stupin's Affidavit [71-Exh. 4] (which the plaintiffs cite in support of their objections to certain defendants' material fact statements), she consistently uses the anagram "LLC."  Thus, the Court will use the anagram "LLC."

outlet mall real estate. Prescott is the General Partner of FVRH and holds a minority interest position in the Borrower.

In 2006, FVRH arranged the acquisition of six (6) properties through the Borrower: 1) Tulare, CA; 2) Darien, GA; 3) Laughlin, NV; 4) Traverse City, MI; 5) Warrenton, MO; and 6) Medford, MN. Borrower financed these acquisitions and related improvements with commercial mortgage backed security (CMBS) debt structured by Greenwich Capital, with Wachovia as servicer and Wells Fargo as trustee. The debt was financed by an interest-only loan in the principal amount of ninety-four million ($94,000,000.00). The Loan Agreement covering this debt was signed by Gamble on behalf of the Borrower on July 27, 2006. Defendants' Exhibit [61-8/G].

As to each of the Properties, Borrower entered into a Management Agreement with Ariel, which provides, among other things, that Ariel would be paid by the Borrower its management fees and leasing commissions for its work managing and operating the Properties. All six (6) Management Agreements are substantially similar. Defendants' Exhibit [61-9/H]. Gamble signed all six (6) Management Agreements on behalf of Borrower and Ariel.

Besides the Borrower and Ariel, there are no other parties to the Management Agreements; defendants CW, Meno, and Woodmont are not parties to the Management Agreements.

As a condition on the loan, Borrower and Ariel entered into an agreement with the Lender[6] entitled Consent and Subordination of Manager (hereinafter referred to as simply the Subordination Agreement), which provides, among other things, that the Management

---

[6]In is somewhat unclear as to who the "Lender" was during the relevant time-period. It appears that Greenwich Capital Financial Products was the original "Lender" as of the promissory note executed on July 27, 2006 for $94,000,000.00. However, at some point during the relevant time-period, Greenwich Capital's rights as the "Lender" were assigned to Wells Fargo Bank, N.A., in its capacity as trustee for the registered holders of Citigroup Mortgage Trust 2007-C6, Commercial Mortgage Pass-Through Certificates, Series 2007-C6 ( the Trust)which is referenced in the Receivership documents as the financing institution seeking the appointment of a receiver. Thus, it can be assumed that during the events leading up to the Receivership, Wells Fargo Bank and/or the Trust became the "Lender."

Agreements and all fees and commissions payable to Ariel as manager of the subject Properties are subordinate to the mortgage.  Defendants' Exhibit [61-11/J].

Paragraph 2 of the Subordination Agreement states the following:

> The Management Agreement and all fees and commissions payable to Manager thereunder are and shall be subject and subordinate in all respects in lien and payment to the lien and payment of (i) the Mortgage, (ii) the Loan Documents, and (iii) any and all modifications, amendments, renewals and/or substitutions of the Mortgage and/or any of the other Loan Documents. Notwithstanding the foregoing, Manager shall not be obligated to Lender to return or refund any fee, commission or other amount duly owed to Manager to the extent that the same is (i) received by Manager prior to default in payment under the Loan, and (ii) duly allocable to the time prior to such default.  Further, if any such default is cured and Lender accepts such cure (and Lender shall have no obligation to accept any cure other than as expressly provided in the Loan Documents and under applicable law), then Manager may receive and retain any fee, commission, or other amount payable to Manager that accrued during the default.  This paragraph 2 shall be self-operative and no further instrument of subordination shall be required.  If requested, however, the Borrower and/or Manager shall execute and deliver such further instruments as the Lender may deem reasonably necessary to effectuate this subordination.

*See*, Defendants' Exhibit [61-11/J].  Thus, the Subordination Agreement states it is "self-operative" and that no further instrument of subordination was required.

Gamble signed the Subordination Agreement on behalf of both the Borrower and Ariel. At time of signing, plaintiffs reviewed and understood Paragraph 2 of the Subordination Agreement.  Gamble understood that Paragraph 2 meant that in the event that the loan was not being paid, all fees and commissions payable to the Manager under the Manager Agreements would not need to be paid.

Paragraph 3 of the Subordination Agreement states the following:

> If there shall occurred and be continuing an Event of Default and the Lender shall have obtained (i) title to the Property (or any portion thereof) whether by foreclosure, deed-in-lieu of foreclosure, bankruptcy sale or otherwise and/or (ii) possession of the Property (or any portion thereof) whether personally or through an agent, a receiver or a trustee, the Manager shall, if and to the extent requested in writing by the Lender and if consented to by Manager after the occurrence of an Event of Default, continue performance under the Management Agreement in accordance with the terms thereof so long as the Manager is paid compensation thereafter accruing under the Management Agreement.  The Borrower and the Manager understand, however,

> that nothing contained herein, in the Mortgage or in any of the
> other Loan Documents shall be construed to obligate the Lender
> to perform or discharge any of the Borrower's obligations, duties
> or liabilities under the Management Agreement.

*See*, Defendants' Exhibit [61-11/J].  Thus, Paragraph 3 of the Subordination Agreement sets out

the conditions under which the Manager (plaintiff Ariel) would be required to continue

performance under the Management Agreement(s) in the event of the Borrower's default.

Paragraph 4 of the Subordination Agreement states the following:

> Upon the occurrence of any default by the Borrower under
> the terms of the Management Agreement, the Manager, shall,
> promptly upon becoming aware thereof, provide the Lender
> with notice in writing thereof, and after receipt of said notice,
> the Lender shall have the same time period within which to cure
> said default as the Borrower has under the Management
> Agreement although the Borrower and the Manager understand that
> the Lender shall not have any obligation to do so. Notwithstanding
> the foregoing, the failure by the Manager to notify the Lender of a
> default under the Management Agreement shall not be deemed to
> constitute a waiver by the Manager of such default.  Furthermore, the
> Borrower and the Manager agree that the Lender may terminate the
> Management Agreement (i) in the event Borrower fails to terminate
> the Management Agreement after instruction to do so by Lender in
> accordance with Section 5.12 of the Loan Agreement, (ii) in the event
> that Borrower has given Manager written notice of an event of default
> under the Management Agreement beyond applicable cure periods,
> (iii) in the event of the Manager's gross negligence, malfeasance or
> willful misconduct, or (iv) by giving five days' notice to the Manager
> upon the Lender (or a successor owner, as the case may be) obtaining
> (A) title to the Property (or any portion thereof) whether by foreclosure,
> deed-in-lieu of foreclosure, bankruptcy sale or otherwise, and/or (B)
> possession of the Property (or any portion thereof) whether personally
> or through an agent, a receiver or trustee.  If the Lender elects to
> terminate the Management Agreement in accordance with Paragraph 4,
> the Borrower and the Manager understand and agree that the Manager
> shall look solely to the Borrower for any and all fees, charges or other
> sums payable to the Manager under the Management Agreement.  If
> the Management Agreement shall be so terminated by the Lender, the
> Manager agrees to cooperate with the Lender to ensure a smooth
> transition to the new property manager.

*See*, Defendants' Exhibit [61-11/J].  Paragraph 4 of the Subordination Agreement sets out the

conditions under which the Lender may terminate the Management Agreement, including but not

limited to, the Lender giving five (5) days' notice to the Manager upon the Lender obtaining

possession of the property through an agent, receiver, or trustee.  Significantly, Paragraph 4

expressly states that upon termination of the Management Agreement, the Manager shall "look

solely" to the Borrower for payment of "any and all fees, charges or other sums payable to the Manager under the Management Agreement"; and further, that the Manager "agrees to cooperate with the Lender to ensure a smooth transition to the new property manager." Thus, Paragraph 4 clearly contemplates the hiring of a new property manager upon the termination of the Management Agreements between Ariel and the Borrower.

Paragraph 5.12.2 of the Loan Agreement provides, in pertinent part, that upon the event of default by the Borrower, "Borrowers shall, at the request of Lender, terminate the Management Agreements and replace Manager with a replacement manager acceptable to Lender in Lender's reasonable discretion and the applicable Rating Agencies on terms and conditions satisfactory to Lender and the applicable Rating Agencies." Defendants' Exhibit [61-8/G].

In April 2009, the Borrower went into default on the Loan. Borrower believed that, mainly due to the economic climate in the real estate sector in 2008 and 2009, it would be unlikely that it would be able to repay the loan at the maturity date.

At the time of the financial crisis at the end of the summer of 2008, there were negative effects that were seen in all parts of the retail industry and specifically in value retail. Leading up to and at the time of the Borrower's default, the Ariel portfolio of outlet centers was under financial stress because of the world-wide economic downturn that started in 2008. This resulted in reduced income to Ariel due to, but not limited to, tenant closings and bankruptcies that created vacancies and reduced income at the properties. This financial stress on the outlet centers was due, in part, to the economic recession which contributed to the Borrower's decision to default on the Loan.

In June 2009, after the Borrower defaulted on the financing loan, defendant CW was retained as the Special Servicer on the loan. As the Special Servicer, CW was required to protect the value of the Assets and seek a course of action that caused the least lost to the Trust/Lender. CW worked with the Borrower on potential modifications to the loan. As the Special Servicer, CW had numerous conversations with Borrower, and its representatives, Ms. Stupin and Mr. Gamble, about potential modifications to the loan, and the possible appointment of a receiver.

Meanwhile, Ariel performed its usual management and leasing functions with respect to the subject Properties. On or about June 19, 2009, Ariel invoiced CW for the standard amount it had received from the Borrower under the Management Agreement. CW, as the Special Servicer, paid the June invoice. However, discussions ensued between CW and Ariel as to Ariel's future management and payment for such during the special servicing period. CW was prepared to pay Ariel an estimated $50,000.00/month while negotiating a restructuring of the Loan with the Borrower(or a possible foreclosure); however, CW was reserving its right to change the Manager per the Loan Agreement. Ariel was aware that CW would not pay leasing commissions and other expenses related to leasing past mid-August 2009.

In August 2009, Ariel and CW began discussions regarding the Ariel trademarks utilized with regard to the Properties. On August 26, 2009, Mr. DeAngelo of CW sent an e-mail with an attachment containing a trademark licensing agreement to Ms. Stupin of Prescott and Ariel. *See*, Plaintiffs' Exhibit 20 to [71]. On August 27, 2009 Ms. Stupin returned the signed and marked up Trademark Licensing Agreement. *See*, Plaintiffs' Exhibit 21 to [71]. CW declined to accept Ariel's suggested changes. Later in the day on August 27, 2009 Ms. Stupin returned, to DeAngelo and Rivero, a signed second version of the proposed Trademark Licensing Agreement which actually was the Trademark Licensing Agreement as originally proposed by CW on August 26, 2009. She noted that this signed agreement was "executed in exactly the form it was sent to us," however, she pointed out that Ariel agreed to work with CW to "finalize a somewhat more detailed agreement" which she hoped would address some issues raised by Ariel in earlier discussions. *See*, Plaintiffs' Exhibit 22 to [71].

The (second and unmarked) Trademark Licensing Agreement returned to CW on August 27, 2009 was signed by Gamble on behalf of both Ariel and the Borrower. Ms. Stupin did not inform her legal counsel, when reviewing the document, that plaintiff Prescott should be added to the signature line. She further failed to apprise CW, or anyone on CW's behalf, upon conveying the signed final version of the agreement, that plaintiff Prescott was the registered owner of the subject trademarks and should have been added to the signature line. At the time he signed the Trademark Licensing Agreement, Gamble knew that Prescott owned the subject trademarks

9

although he had earlier believed that Ariel owned the subject trademarks.  However, although he knew when signing the agreement that Prescott owned the trademarks, he believed that Prescott had authorized Ariel to use the trademarks and allow other entities to use them on appropriate terms.  At no time, did either Stupin or Gamble, on behalf of either plaintiff, edit the signature line for the licensor to reflect that the Prescott Group was the registered owner of the subject trademarks.  Finally, although received by DeAngelo on or about August 27, 2009, he never added his signature to the agreement.

The Trademark Licensing Agreement[7] states the following:

> Dear Sirs:
>
> As you are aware, the Borrower is currently in default on the above-referenced Loan and as a result of such default, Lender has to**[sic]** the right **[sic]** approve any distributions of rents received. Furthermore, pursuant to paragraph 5.12.2 of the Loan Agreement, if an Event of Default exists or if the Borrower fails to maintain a Debt Service Coverage Ratio of at least 1:10 to 1:00, Borrower shall, at the request of Lender, terminate the Management Agreements and replace Management Company with a replacement manager acceptable to Lender in Lender's reasonable discretion.
>
> The Lender is prepared to approve and wire to the Management Company [$260,00.00] to cover certain expenses that were incurred by the Management Company provided that the Management Company agree **[sic]** to certain conditions.  As we have discussed, the release of the above-referenced funds is conditioned upon the Management Company's agreement that if it is terminated as provided in the applicable Management Agreements, it will allow the Borrower, Lender or any receiver (appointed at the request of Lender) to use the name "Ariel Preferred Retail Group LLC" or any reasonable deviation thereof in the operation and management of the various properties currently being managed under the Management Agreements; provided that the use of such name (or any deviation thereof) shall be used in a manner consistent with the manner that such name was used by the Management Company in its operation and management of the properties.
>
> Please indicate your agreement to the above-condition relating to the use of the "Ariel Preferred Retail Group LLC" name by executing in the space provided below.

---

[7]The parties refer to this document as the "letter agreement" and/or the "trademark licensing agreement." For purposes of clarity and judicial economy, the Court will refer to the document referenced in plaintiffs' Exhibits 20, 21, and 22; and defendants' Exhibits O, P, and Q as "trademark licensing agreement."

Defendants' Exhibit [61-16/Q].  Again, it is signed by Gamble on behalf of Ariel and the Borrower; and not signed by either Stupin or Gamble on behalf of Prescott, nor signed by DeAngelo.[8]  The parties agreed to negotiate another trademark licensing agreement.  Throughout the fall of 2009 and into 2010, the parties and their representatives exchanged several emails concerning, and drafts of, another trademark licensing agreement but were unable to reach an agreement over terms.  Defendants' Exhibit [61-20/S].

On or about August 27, 2009 CW tendered the $260,000.00 payment to Ariel. Also at this time separate discussions were on-going between Ariel and CW as to management services and payment thereof.  CW proposed paying Ariel $50,000.00 per month for Ariel's management services until a probable receiver was appointed.  Ariel counter-proposed that it continue management services for 5% of gross revenue or no less than $50,000.00 per month.  *See*, Defendants' Exhibit [61-15/N].

In a letter from Gamble to DeAngelo, dated October 16, 2009, regarding the voluntary appointment of a receiver and the transition of property management, Gamble stated that a "separate agreement between the Servicer and Manager would need to be agreed and would address the terms under which Manager will provide services during this transition." Defendants' Exhibit [61- 0/I]. On October 16, 2009, aware of the impending probability of a receiver being appointed, and in anticipation of a new manager being put in place, Ms. Stupin wrote DeAngelo suggesting that CW pay Ariel $55,00.00 per month through the end of the transition period.  She suggested a new agreement between the Special Servicer (CW) and the Manager (Ariel) to cover the transition period.  *See*, Defendants' Exhibit [61-27/Z].  An agreement was reached and Ariel invoiced CW for $50,000.00 per month for management services in September, October, and November 2009 which CW paid.

Meanwhile, in July 2009 Mr. Meno and one other Woodmont representative participated in a telephone call with Burr Ault of CW.  In or about August 2009, Ault asked Woodmont to make proposals to manage two (2) properties in Texas.  Woodmont submitted the requested

---

[8]Plaintiffs do not raise the issue of DeAngelo's failure to sign the agreement, apparently conceding that it was technically unnecessary.

proposals and was awarded a contract for one property in Brownsville, Texas, a 100,000 sq.ft. "big box" mall; however the second Texas contract was awarded to another company.  In or about September 2009, upon request, Woodmont submitted a proposal to CW regarding the Ariel Properties.  Other than the Brownsville property, and the Ariel Properties, the only other business that Woodmont has done with CW involved managing an outlet center in Sedona, Arizona between approximately March and September 2010.  DeAngelo did not know or have any working relationship with Woodmont or Meno prior to Meno's appointment as Receiver for the subject Properties.

In December 2009, CW, as Special Servicer and on behalf of the Lender, petitioned the Superior Court of Gwinnett County, State of Georgia for appointment of a receiver.  On December 11, 2009 the Superior Court of Gwinnett County, State of Georgia appointed Meno as the Receiver pursuant to a Consent Order Appointing Receiver.  Defendants' Exhibit [61- 6/E].

As a general matter, CW did and does not retain borrower-affiliated entities as property managers for properties on which CW was a special servicer.  On December 16, 2009 Meno as Receiver, wrote Ariel via Stupin, informing Ariel of its termination as Manager.  Meno contracted with Woodmont to perform property management and leasing services for the Properties.  Meno also hired Ariel employees to continue operating the outlet centers under new management. Meno emailed Ault and DeAngelo (among others) about the change in management of the Properties. His email stated as follows:

> Just a quick update to let you know that I have spoken with Susan Stupin and told her of the Receivers **[sic]** decision to change management effective immediately.  Not surprisingly, she's not happy.
>
> I have also personally spoken with all the on-site teams at the 6 centers to let them know of the Receiver appointment and the discontinuance of Ariel as manager.  I also offered each continued employment on-site at the property as an employee of The Woodmont Company and I am pleased to report that each accepted my offer.
>
> We will be arranging for a national conference call tomorrow with all field staffs in order to introduce them to the various Woodmont team members that they will be reporting to and the transition process being undertaken.

> I will be forwarding the proposed tenant notice to all of you
> momentarily noting the Receiver appointment and management
> change.

Defendants' Exhibit [79-1].  After the Receiver was appointed and Ariel was terminated as

manager, the majority of Ariel's employees did not have a reasonable expectation of continued

employment with Ariel.  It is not uncommon that when a property manager is replaced, site

employees will often go to work with the new manager.

Section 10.1 of the Receivership Order states:

> No person or entity shall file suit against the Receiver, or take
> other action against the Receiver, without an order of this Court
> permitting a suit or action provided, however, that no prior
> Court order is required to file a motion in this action to enforce
> the provisions of this Order or any other order of this Court in
> this action.

Defendants' Exhibit [61-6/E].

Section 10.3 of the Receivership Order, states among other things, that the Receiver and

its agents "shall have no claim asserted against them relating to the Receiver's duties under this

order, except for claims due to their gross negligence, gross or willful misconduct, malicious acts

or the failure to comply with this Court's orders."  Defendants' Exhibit [61-6/E].  Prior to filing

this lawsuit, and to-date, plaintiffs have not obtained any order from the Superior Court of

Gwinnett County, State of Georgia, permitting this lawsuit. The plaintiffs have not, to-date, filed

any type of lawsuit or legal intervention with the Superior Court of Gwinnett County, State of

Georgia, to enforce any provision of the Receivership Order.  The instant lawsuit does not seek to

enforce the provisions of the Receivership Order.

The Receivership Order sets forth the conditions under which the Receiver and his agents

can and must operate the Receivership property.  Section 2 of the Receivership Order outlines,

and is titled, the "**Receiver's Duties and Authority**."  Defendants' Exhibit [61-6/E].  Section

2.1(m) of the Receivership Order provides in pertinent part:

> The Receiver shall be vested with and shall discharge the
> following authority, powers, and duties:
>
> (m) To operate the Receivership Property under any existing
> name or tradename (or new name, the Receiver deems

13

appropriate to do so).

Section 5.1 of the Receivership Order defines "Receivership Property" as including, but

not limited to, the following:

> (b) The real property and improvements encumbered by the
> Mortgages;
> (c) The Properties;
> (d) All tangible and intangible property usable in connection
> with the operations of the Properties, including, without limitation,
> the Collateral;
> - - - - - - - - - -
> (f) All fixtures, trade fixtures or tenant improvements of every kind
> or nature located in or upon or attached to or used or intended to be
> used in connection with the operation of the Properties and any real
> property, buildings, structures or improvements located on the real
> property (to the full extent of Defendants'[9] interest in same).

Defendants' Exhibit [61-6/E].

The Ariel Trademarks were existing names or trade names utilized in the identification

and marketing of the Properties.  To the extent the trade names were left in place and used on

signage and other marketing materials, Meno and Woodmont used those trade names to operate

the Receivership Property.

Prior to the Georgia Court entering the Receivership Order, principals of Prescott

reviewed drafts of the Receivership Order, and Gamble executed the Receivership Order on

behalf of the Borrower.  Prescott, having reviewed drafts of the Receivership Order, and through

Gamble, was aware of the authority that was granted to the Receiver under the Receivership

Order.

Sections 1.2 and 1.4 of the Receivership Order required the Receiver to pay Ariel

$50,000.00 for its "work and cooperation during the thirty (30) day transition period," and

another $50,000.00 for Ariel's availability to assist with the transition for the following 30 day

period.  The Receiver paid Ariel both of the two (2) $50,000.00 transition payments. Other than

the two (2) $50,000.00 transition payments, there is no provision in the Receivership Order that

required any of the Defendants to pay Ariel any management, leasing, or other fees.

---

[9]The "Defendants" referenced in the Receivership Order are not the "Defendants" in the
instant lawsuit.

After the Receiver was appointed, Ariel did not engage in any leasing activities during the transition period other than communications with tenants concerning matters already in place.

In September 2011, this Court dismissed two (2) claims from the plaintiffs' amended complaint: a claim for tortious interference with a contract and/or business relationship; and a claim for fraud. *See*, Court Order [55 and 56]. It is important to reiterate what the substance of the plaintiffs' complaint now entails. The trademark infringement claims assert that the defendants continued to use the plaintiffs' trade names and/or trademarks in marketing/leasing the Assets after termination of Ariel as the Manager of the subject Properties. The breach of contract claim asserts that the defendants failed to pay plaintiff Ariel its contractual management fees and leasing commissions. The unjust enrichment claim asserts that the defendants failed to pay the afore-referenced fees while retaining Ariel's services, and "poached" Ariel's site employees. Finally, the unfair competition claim asserts that defendants took certain actions to undermine plaintiff Ariel as a competitor in the field of commercial properties management and leasing.

More significant is what is not part of the plaintiffs' amended complaint such as any legal claims pertaining to the restructuring of the loan between the Borrower (non-parties to this cause of action) and the Lender as facilitated by CW as the Special Servicer. Furthermore, what is not in the amended complaint are legal claims pertaining to any alleged legal obligation that the defendants had to retain Ariel as the Manager of the Properties once the loan was defaulted on by the Borrower and/or the Georgia state court appointed defendant Meno as the Receiver. There are no legal claims challenging the appointment of Meno as the Receiver. Finally, what is not in the amended complaint are any legal claims alleging that the defendants acted in a "conspiracy" to further their own financial gain to the detriment of the Lender and/or Bondholders. Although the plaintiffs argue that the defendants' alleged intent to financially destroy Ariel is relevant to the plaintiffs' infringement claims because willful conduct allows for the recovery of attorneys's fees and costs under 15 U.S.C. §1117(a), the simple fact is that the defendants do not deny using the trade names/trademarks, instead, arguing that their use was lawful under the Receivership Order and/or the Licensing Agreement. Thus, although "intent" and "motive" may have been

15

germane to the now-dismissed tortious interference and fraud claims, they are no longer pertinent to the remaining claims, except as to the Court's consideration of the defendants' alleged "intent to confuse consumers" by its use of the Ariel marks.

Plaintiffs exert a considerable amount of effort arguing matters outside the scope of this litigation; thus, it is somewhat difficult to ascertain exactly the substance of their claims. However, as to the trademark infringement and unfair competition claims, plaintiffs appear to argue that 1) since Prescott, and not Ariel, is the owner of the subject trade names/ trademarks, and Prescott was not a party to the receivership proceedings, the Receivership Order cannot be used by these defendants as authority to use the subject trade names/trade marks; 2) that the Receivership Order only refers to "trade names" and not "trade marks" and even if they could use some of the "trade names and/or trademarks, there is no authority permitting the use of the "ribbon design trademark"; 4) that the Licensing Agreement was only a "temporary" agreement that the plaintiffs terminated in early December 2009 (prior to the entry of the Receivership Order); 5) that the Licensing Agreement should be considered null and void because the plaintiffs were "coerced" into signing it due to the "economic duress" placed on them by the defendants; 6) that the Licensing Agreement fails to give the Receiver and Woodmont authority to use the subject trade names/trademarks because Ariel was never terminated as the Manager; and 7) the alleged improper use of the subject trade names/trademarks has caused "actual confusion" among consumers.  As for the breach of contract claim, plaintiffs fail to specifically identify what or which contract defendants allegedly breached.  However, it appears that they contend that due to payments made by defendants to the plaintiffs during the special servicing period, defendants have continued a "course of dealing" and are thereby obligated to pay the defendants for management services and leasing commissions allegedly due the plaintiffs under the Management Agreement.  As for the unjust enrichment claim, plaintiffs argue that the defendants have failed to pay them, pursuant to the Management Agreement, for services rendered and that defendants have further "poached" the plaintiffs' employees to provide management services for the defendants.

Defendants counter on several grounds.  Firstly, the defendants contend that pursuant to the Receivership Order, plaintiffs were required to obtain permission from the Georgia state court before filing this lawsuit against the Receiver (Meno), and the Receiver's agent (Woodmont).  Since such permission was never sought and/or granted, defendants argue that this Court lacks subject matter jurisdiction over defendants Meno and Woodmont.  Defendants further argue that as the Special Servicer, CW, never used the trade names/trademarks because as the Special Servicer and representative of the Lender, it only administered the defaulted loan, took financial control of the Assets, and following unsuccessful restructuring of the loan, took steps to seek the appointment of a receiver.  Defendants further argue that even if any one of the defendants used the subject trade names/trademarks, such use was authorized under the Licensing Agreement and/or the Receivership Order.  Defendants further contend that both the Licensing Agreement and the Receivership Order cover all the disputed trade names/trademarks.  Defendants further argue that plaintiffs have failed to show any "actual confusion" by the alleged use of the subject trade names/trademarks because the plaintiffs' exhibits only show that vendors sought payment of invoices for services provided by Ariel while it still acted as Manager (prior to the entry of the Receivership Order) and furthermore, none of the exhibits show any connection between the use of the trade names/trademarks and the payments sought.  Finally, as to the trademark infringement and unfair competition claims, defendants contend that plaintiffs are not entitled to attorneys' fees and costs because the alleged use of same was not malicious, fraudulent, deliberate , or willful because the defendants had the authority (or the good-faith belief they had authority) under the Licensing Agreement and/or the Receivership Order.

As for the breach of contract claim, defendants first point out the plaintiffs have failed to identify any particular contract that defendants have breached.  Defendants contend that any payments made to plaintiffs during the special servicing period were for past services rendered, at an agreed upon rate, and were pursuant to the Licensing Agreement.  Since they made the payments as set forth in the Licensing Agreement, they could not have breached the Licensing Agreement. Defendants point out that they were not parties to the Management Agreement which clearly states that the Borrower alone was required to pay all management fees and leasing

commissions.  Thus, defendants could not have committed any act breaching the Management Agreement.  Furthermore, the defendants argue that they were not legally obligated to pay any management fees or leasing commissions once the Receivership Order was entered and the Receiver terminated the Management Contract, other than payments as set forth in the Receivership Order. The defendants further contend that any breach of contract claim can only be lodged against defendant CW because the other defendants cannot be liable for breach of any contract once the Receiver was appointed, Ariel was terminated as Manager, and Woodmont was hired by the Receiver to manage the Properties.  Finally, the defendants argue that the Consent and Subordination Agreement was "self-operative" and that once the loan was in default, the Management Agreement and all fees and commissions payable under the Management Agreement were subordinate to the loan.  Nothing obligated the defendants to continue paying Ariel as Manager under the Management Agreement and all the defendants did was offer to pay Ariel a reasonable compensation if it chose to continue providing services through the transition; which Ariel did and for which the defendants duly compensated it.

As for the claim of unjust enrichment, defendants contend that they had no obligation to retain Ariel as Manager once the Receiver was appointed, that Ariel was fairly compensated for services rendered during the transition period, and Ariel was further fairly compensated for the continued use of the subject trade names/trademarks.  As for "poaching" former Ariel employees, defendants contend that there was no legal preclusion to asking former Ariel site employees if they desired to continue in their employment as employees of Woodmont.  Ariel had been terminated as Manager of the Properties, and there were no employment contracts (at least at issue in this lawsuit) preventing the subject employees from leaving Ariel's employment to work for Woodmont.

The Court must first address the jurisdictional issue regarding defendants Meno, as the Receiver, and Woodmont, as the Manager of the subject Properties.  Defendants contend that Meno and Woodmont should be dismissed as a matter of law from this lawsuit under Barton v. Barbour, 104 U.S. 126, 136 (1881) and its progeny.  Plaintiffs contend that Barton, supra. is inapplicable because they have asserted claims of willful infringement; and, the defendants

actions were outside the scope of the Receivership Order, and thus, *ultra vires*.  They further contend that even if <u>Barton</u> is applicable, it is only applicable as to Meno and not Woodmont because Meno is the Receiver.

After careful consideration of the matter, the Court determines that it lacks subject matter jurisdiction over both defendants Meno and Woodmont pursuant to the Receivership Order, and under <u>Barton v. Barbour</u>, *supra.*

In <u>Barton v. Barbour</u>, *supra.*, the United States Supreme Court held that absent statutory authority, a receiver cannot be sued (or initiate suit) without leave of the appointing court.  This rule, known as the "Barton Doctrine" has been consistently upheld by federal courts since its announcement in 1881.  *See*, <u>Republic Bank of Chicago v. Lighthouse Management Group</u>, 829 F.Supp.2d. 766, 772 (D.Minn. 2010) *citing* <u>Seaman Paper Co. of Mass. v. Polsky</u>, 537 F.Supp.2d. 233, 236 (D. Mass. 2007)(collecting cases); *see also*, <u>Donovan LE v. SEC and Michael A. Grassmueck, in capacity as Receiver</u>, 542 F.Supp.2d. 1318, 1321-22 (N.D.Ga. 2008)(noting that the Barton Doctrine has been applied in federal courts nationwide throughout the years and not exclusively in the context of suits against a bankruptcy trustee) *citing* <u>Carter v. Rodgers</u>, 220 F.3d. 1249, 1252-53 (11th Cir. 2000). The purpose of the Barton Doctrine is to "promote judicial economy by protecting the receiver and receivership estate from a multiplicity of lawsuits."  *See*, 16 **Fletcher Cyc. Corp**. §7855 (cases collected). The necessity for leave from the appointing court cannot be circumvented by simply seeking relief in another court, be it a federal or state court.  16 **Fletcher Cyc. Corp.** §7855 (cases collected).

As stated earlier, Section 10.1 of the Receivership Order clearly states that no person or entity can file suit against the Receiver without first obtaining leave from the appointing court; i.e. the Gwinnett County Court.  It is undisputed that plaintiffs have not, to-date, received such permission.

As stated earlier, Section 10.3 of the Receivership Order states, among other things, that the Receiver and its agents, employees, and attorneys "shall have no claim asserted against them

relating to the Receiver's duties under this order, except for claims due to their gross negligence, gross or willful misconduct, malicious acts or the failure to comply with this Court's orders."

The Barton Doctrine is not without exceptions. It does not apply to acts by the Receiver outside the scope of its authority as the receiver. *See*, Lingenfelter v. Stoebner, 2005 WL 1225950, *2-*3 (D.Minn. July 26, 2006), *aff'd* 188 Fed.Appx. 554 (8th Cir.2006); Alexander v. Hedback, 2012 WL 2004103, *14 (D.Minn. June 5, 2012)(*citing* Lingenfelter, *supra.*).

Plaintiffs contend that they can sue Meno and Woodmont because they have alleged willful and malicious acts in connection with their trademark infringement claims. As will be examined further in detail later in this memorandum, all acts by Meno and Woodmont were done within the scope of the Licensing Agreement and/or the Receivership Order. Meno was duly appointed the Receiver and was charged by the Georgia state court with the authority to, among other things, to "maintain, secure, manage, operate, repair and preserve the Receivership Property"; to "assume control over the Receivership Property and to collect and receive all Income"; to "retain, hire or discharge on-site employees (none of whom are or shall be deemed to be employees of Plaintiff) on behalf of the receivership and without any liability to the Receiver"; to "operate the Receivership Property under any existing name or trade name (or new name, if the Receiver deems appropriate to do so); and to "make payments and disbursements in the ordinary course of business, as may be needed and proper for the preservation of the Properties." Defendants' Exhibit [61-6/E], §§2.1(a), (c), (f), (m), and (r). All the alleged infringing acts were taken by Meno and Woodmont within the scope of their authority as Receiver and Manager in administering the Receivership Property.

As for the plaintiffs' contention that the Barton Doctrine is inapplicable as to Woodmont, this contention is also meritless. Firstly, the Receivership Order clearly contemplates the Receiver hiring other persons or entities in order to effectively administer the Receivership Property. *See*, Defendants' Exhibit [61-6/E], Section 10.3. Furthermore, "[T]he *Barton* rationale extends to agents who are `the functional equivalent of a trustee **[or in this case, a receiver]**, where they act at the direction of the trustee **[or receiver]** and for the purpose of administering

20

the estate or protecting its assets.'"  Lingenfelter, 2005 WL 1225950, *3 *quoting* DeLorean

Motor Co., 991 F.2d. 1236, 1241 (6th Cir. 1993)(other citations omitted); *see also*, Barton v.

Barbour, 104 U.S. at 137 (wherein the Supreme Court held that a court does not have jurisdiction

if the plaintiff has failed to obtain leave of court from the appointing court to file suit against a

receiver for the receiver's actions "or that of his servants"); Lawrence v. Goldberg, 573 F.3d.

1265, 1270 (11th Cir. 2009)(affirming dismissal of lawsuit in district court under Barton due to

plaintiff's failure to seek leave from bankruptcy court to file action against the Trustee and other

parties assisting the Trustee in carrying out his official duties).

The plaintiffs further contend that the Barton Doctrine does not apply because the

Receiver's actions were *ultra vires*.  An exception to the Barton Doctrine exists if "the receiver

takes possession of property belonging to another" since such a taking would constitute the

receiver acting *ultra vires*.  Barton v. Barbour, 104 U.S. at 134.  This argument is meritless.

Again, as will be detailed further in this memorandum, both the Licensing Agreement and

the Receivership Order granted the defendants the authority to use plaintiffs' intellectual

property; trade names and/or trademarks.  Defendants have never contended that they took

"possession" only that they were authorized to "use" the trade names/trademarks in connection

with the marketing and leasing of the Assets.  The crux of the plaintiffs' argument is that it was

improper for the Receivership Order to authorize the Receiver (and its agent, Woodmont) to use

their marks because neither Prescott nor Ariel were a party to the Receivership Order.

Essentially, the plaintiffs are contending that the Receivership Order is inherently flawed and

should not be enforced.  This is the very reason that the Barton Doctrine was created and has

been consistently applied by federal courts since 1881.

The evidentiary record shows that the two principals of Ariel and Prescott, Stupin and

Gamble, were well-aware of the Receivership proceeding, and in fact, reviewed drafts of the

Receivership Order.  At all relevant times, they knew the scope of the Receivership Order,

including the Receiver's authority to use the Ariel marks existing on the Properties.  At no time

while reviewing drafts of the Receivership Order did either plaintiff approach the Gwinnett

County Court to intervene or voice any objection.  Even after being put on notice of the

21

Receivership Order has either plaintiff petitioned the Georgia state court to vacate, modify, or amend the Receivership Order.  The plaintiffs' claims against Meno and Woodmont amount to a challenge to the Receiver's authority to use the Ariel trade names/trademarks in connection with the Properties.  This is precisely the type of claim that required the plaintiffs to obtain leave of the Gwinnett County Court before filing suit against Meno and Woodmont.  *See*, Donovan LE, at 1321.

Since the plaintiffs, to-date, have failed to seek leave of the Gwinnett County Court to file this lawsuit against Meno, as Receiver, and Woodmont, as Manager and agent of the Receiver, this Court lacks subject matter jurisdiction over the claims asserted against defendants Meno and Woodmont.

This leaves the plaintiffs' claims as to breach of contract and unjust enrichment, as well as the trademark infringement claims against defendant CW only.  Nonetheless, this Court also will address their claims as they apply to Meno and Woodmont and as if there was subject matter jurisdiction on those defendants.

**Breach of Contract**

Plaintiffs admit that their claim for breach of contract as contained in their amended complaint is "not crystal clear;" however, they contend that plaintiff Ariel "believed it had formed a contract with CW consistent with the terms of the Management Agreements." Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment [68], pg. 33. It appears that the plaintiffs contend that CW's payment, as Special Servicer, of a July 2009 invoice for June 2009 management services constituted a "course of dealing" which obligated CW to abide by the provisions of the Management Agreement.  They further appear to argue that the Management Agreement remained intact and obligated CW, as Special Servicer, to pay Ariel its "customary" management fees (and presumably, leasing commissions) until at least December 16, 2009 (when Receiver Meno terminated Ariel as the Manager).  Plaintiffs contend that the Consent and Subordination Agreement is inapplicable because defendant CW never "invoked" it.

It is undisputed that none of the defendants were ever a party to the Management Agreement.  The Management Agreement was strictly between Ariel and the Borrower.  There is

no evidence whatsoever which directly obligates any of the defendants to perform any act, including payment of management fees and/or leasing commissions, pursuant to the terms of the Management Agreement.  By the plaintiffs' own words, it is not the Management Agreement that they considered breached but instead some type of other contractual relationship "consistent with the terms of the Management Agreements."  Thus, defendant CW[10] did not breach the Management Agreement and would be entitled to judgment as a matter of law.

However, plaintiffs have offered a theory of liability based upon an alleged "course of dealing" which they believe obligates CW to abide by the terms of the Management Agreement. This "course of dealing" argument fails.

Firstly, contrary to the plaintiffs' belief, the Consent and Subordination Agreement must be "invoked" is clearly contrary to the express terms of the Agreement.  The Subordination Agreement unequivocally states that it is "self-operative."  Nowhere does it state or even remotely hint that some action must be taken to "invoke" the provisions of the Subordination Agreement.

Plaintiffs contend, in the alternative, that if the Subordination Agreement applies, then Paragraph 3 obligated CW, as the "representative of the Lender" to honor the terms of the Management Agreement because it requested Ariel to continue to manage the subject properties until the receivership took place.  Plaintiffs contend that when this request was made, "they created continuing mutual obligations outside of the subordination, which entitled Ariel to compensation for the required level of services." This argument fails.

Firstly, Paragraph 3 clearly states that in the event of a default, the Lender could in writing request Ariel to continue its management services and if the Manager agrees to do so, the Manager would be compensated under the terms of the Management Agreement.  It is undisputed that the Lender never requested Ariel, in writing, to continue performance under the Management

---

[10]Although the plaintiffs lodge their breach of contract claim against "defendants," their pleadings clearly indicate that their claim is directed to CW only.  The Court agrees with CW's assessment that the plaintiffs have failed to offer any theory under which Meno and/or Woodmont could be held liable for breach of contract once the Receiver was appointed, the Receiver terminated Ariel as Manager, and appointed Woodmont as Manager under the auspices of the Receivership Order.

Agreement.  Furthermore, the Subordination Agreement makes it clear, and the plaintiffs do not dispute, that in event of a default of the loan, Ariel could not look to the Lender, or in this case, CW, to "perform or discharge any of the Borrower's obligations, duties, or liabilities under the Management Agreement."  Defendants' Exhibit [61-11/J].

Secondly, CW consistently told Ariel that it was not seeking Ariel's continued performance **under the Management Agreement**.  It consistently communicated to Ariel that if Ariel wished to continue managing the properties during the special servicing period (and in anticipation of a receivership), CW offered to pay Ariel $50,000.00 per month.  Ariel was well-aware that CW was not assuming any obligations, whether or not on behalf of the Lender, under the Management Agreement.  In a memorandum dated August 10, 2009 Don Chapman, the Managing Director of Ariel, wrote of CW's position that it would exercise its right under the loan document to change managers or it was prepared to offer Ariel $50,000.00 per month "as a holding position while they negotiate with FVRH **[the Borrower]** or foreclose on the assets." Defendants' Exhibit [61-13/L].  Furthermore, Chapman, in the same memorandum, stated that CW "had made it clear that they will not likely fund any substantial TI/TA/LC expenses related to current leasing activity; the Manager cannot expect any near term revenue from lease commissions."  Defendants' Exhibit [61-13/L].  Within a week of receiving Chapman's memorandum, Stupin acknowledged CW's position and sent DeAngelo and Rivero a new management and leasing proposal for the FVRH portfolio.  Defendants' Exhibit [61-15/N]. Furthermore, as the appointment of a receiver became more probable, Gamble wrote DeAngelo that "a separate agreement between the Servicer and Manager would need to be agreed and would address the terms under which Manager will provide services during this transition." Defendants' Exhibit [61-10/I]. This same date, Stupin wrote DeAngelo suggesting that CW pay Ariel $55,000.00 per month through the end of the transition period; and further suggested a new agreement between the Special Servicer and Ariel to cover their respective obligations during the transition period.  Defendants' Exhibit [61-27/Z].

24

Thus, it is clear, and no juror could reasonably find otherwise, that CW had no intention of abiding by the Management Agreement on behalf of itself or any other entity, and that Ariel was well aware of this fact, and was actively pursuing a new contractual relationship between itself and CW, as the Special Servicer.

As for Ariel's "course of dealing" argument binding CW to the terms of the Management Agreement, this argument also fails.

Under Missouri law, an existing written contract may be modified and enforceable only by mutual assent and consideration.  Guidry v. Charter Communications, Inc., 269 S.W.3d. 520, 528 (Mo.App. 2008)(internal citation omitted).  A court must look to the parties' "*objective* manifestations of intent to determine whether there was a 'meeting of the minds.'"  Guidry, at 528 *quoting* Don King Equipment Co. v. Double D Tractor Parts, Inc., 115 S.W.3d. 363, 365 (Mo.App. 2003).  Thus, one party to a unilateral contract may not unilaterally alter its terms since modification requires mutual assent.  Stephenson v. Village of Claycomo, Missouri, 246 S.W.3d. 22, 27 (Mo.App. 2007).  Even the later conduct of the parties cannot modify a written contract unless the evidence shows mutual assent and additional consideration for the modification.  Cordry v. Vanderbilt Mortgage & Finance, Inc., 445 F.3d. 1106, 1111 (8th Cir. 2006)(citing Missouri law).

However, despite the formalities of offer and acceptance for a contract to be formed, the parties' later conduct may be such that it does show mutual understanding and agreement.  "The parties' actions must support a reasonable inference of mutual understanding and agreement that one party perform and the other party compensate for such performance.  The parties' course of conduct may lead to the necessary implication that a contractual obligation exists."  Guidry, at 529 (internal citations omitted).

Here, the plaintiffs contend that CW's single July payment for an invoice Ariel sent it for June management services demonstrates a "course of dealing" which tied CW to the terms of the Management Agreement.  Ariel offers no caselaw to support this supposition that a single event can demonstrate a "course of dealing" which leads to "the necessary implication that a contractual obligation exists."  When viewing the parties' actions over the course of months

25

during the special servicing period leading up to the receivership, the Court finds, and no reasonable juror could conclude otherwise, that there was no mutual assent and agreement that CW would take the place of the Borrower and pay Ariel for management and leasing services pursuant to the Management Agreement.

Pursuant to an independent agreement reached between Ariel and CW, Ariel invoiced CW for $50,000.00 per month for management services in September, October, and November 2009 which CW paid.  Furthermore, pursuant to the Licensing Agreement, CW agreed to pay Ariel and additional $260,000.00 for Ariel's continuing management services during the transition period, and for a license for the Lender, Borrower or any court-appointed receiver to use Ariel's trade names/trademarks upon Ariel's termination as Manager.  There is no dispute that CW made the $260,000.00 payment to Ariel.  Finally, the Receivership Order required the Receiver to pay Ariel $50,000.00 for Ariel's cooperation during the first 30 days of the transition to Woodmont's management of the Properties, and an additional $50,000.00 for Ariel's continued cooperation over the second 30 days of transition.  There is no dispute that the Receiver made these payments to Ariel.  Thus, there is no material factual dispute that the defendants breached any other contract they might have entered into with Ariel.

There is no material issue of fact that none of the defendants were a party to the Management Agreement and/or that CW, acting as the Special Servicer, manifested any mutual assent to oblige itself to the terms of the Management Agreement during the transition period. There is no material issue of fact that the defendants satisfied any and all obligations they may have had under any other agreements they entered into with or affecting Ariel.  Consequently, the defendants are entitled to summary judgment on the plaintiffs' breach of contract claim as contained in Count V of the plaintiffs' amended complaint.

### Unjust Enrichment

Plaintiffs bring their unjust enrichment claim on the basis of Ariel's management and leasing services, the defendants' hiring of former on-site Ariel employees, and the defendants' use of the Ariel marks.

26

Under Missouri law, the elements of unjust enrichment are 1) a benefit conferred on the defendant by the plaintiff; 2) appreciation by the defendant of that benefit; and 3) acceptance and retention of the benefit under circumstances that it would be inequitable for defendant to retain the benefit without paying for its value.  U.S.Bank National Assoc. v. Cox, 341 S.W.3d 846, 852 (Mo.App. 2011)(citations omitted); Affordable Communities of Missouri v. EF&A Capital Corp., 2012 WL 43520, *12 (E.D.Mo. January 9, 2012); Affordable Communities of Missouri v. EF&A Capital Corp., 2011 WL 3665141, *12 (E.D.Mo. August 22, 2011).  Thus, under Missouri law, "[A]n unjust enrichment has occurred where a benefit was conferred upon a person in circumstances in which retention of the benefit, without paying its reasonable value, would be unjust."  S & J, Inc.v. McLoud & Co., 108 S.W.3d 765, 768 (Mo.App. 2003); *see also*, Webber v. St. Louis County, et. al., 2010 WL 4628625, *8 (Mo.App. November 16, 2010)(*quoting* S & J, Inc. v. McLoud & Co., *supra.*).

"The third element [of an unjust enrichment claim], unjust retention of the benefit, is considered the most significant and the most difficult of the elements."  U.S. Bank, at 852 *quoting* Adams v. One Park Place Investors, LLC, 315 S.W.3d 742, 749 (Mo.App. 2010).  In determining whether the defendant's retention of the benefit is unjust, courts should consider whether any wrongful conduct by the defendant contributed to the plaintiff's disadvantage.  S & J, Inc. v. McLoud & Co., at 768 *citing* Graves v. Berkowitz, 15 S.W.3d 59, 61 (Mo.App. 2000).  The mere receipt of benefits is inadequate to show unjust enrichment in the absence of any showing that it would be unjust for the defendant to retain the benefit.  S & J, Inc. v. McLoud & Co., at 768 *citing* Farmers New World Life Ins. Co. v. Jolley, 747 S.W.2d 704, 706 (Mo.App. 1988).  "There must be some something more than passive acquiescence, such as fault or undue advantage on the part of the defendant, for defendant's retention of the benefit to be unjust."  S & J, Inc. v. McLoud & Co., at 768 *quoting* Graves, at 64.  Finally, there can be no unjust enrichment if the parties receive what they intended to obtain.  U.S. Bank, at 853 *citing* American Standard Ins.Co.of.Wisconsin v. Bracht, 103 S.W.3d 281, 293 (Mo.App. 2003).

As to Ariel's management and leasing services, there is nothing in the record indicating that any one of the defendants engaged in wrongful conduct.  None of the defendants was a party

to the Management Agreement.  The Subordination Agreement did not obligate CW to continue the Borrower's payment obligations.  Ariel and CW entered into independent agreements whereby CW would pay Ariel $260,000.00 for past management services, and for a license to use Ariel's marks by the Lender, Borrower, or any appointed receiver upon Ariel's termination as Manager.  Furthermore, CW agreed to pay an additional $50,000.00 per month for Ariel's continued management services during the transition period.  During the negotiation for a new management arrangement, Ariel had proposed to continue to perform management services for 5% of gross revenue or no less than $50,000.00 per month.  Although later, Ariel sought an additional $5000.00 per month, the fact still remains that Ariel and CW came to an agreement for the $50,000.00 per month.  CW paid all amounts it agreed to, and reasonably within the range that Ariel had desired. Ariel may believe it was entitled to more or that the payments did not compensate Ariel "fully" but the fact still remains that Ariel invoiced CW at $50,000.00 per month during the transition period, and CW paid this amount. Thus, there was no wrongful conduct by CW in retaining Ariel's management services without due compensation. Thus, the evidentiary record demonstrates, and no reasonable juror could find otherwise, that CW and Ariel received what they intended to obtain.

As for the leasing commissions, the evidentiary record is clear that CW consistently informed Ariel that it would not pay for leasing commissions, and Ariel always understood this. If Ariel continued to engage in leasing activities after being informed that CW would not pay for such activities, CW's alleged retention of the benefit fails to show that the retention was unjust. Ariel cannot perform services for which CW clearly did not agree to compensate, then demand payment because something more than passive acquiescence, such as wrongful conduct by CW, is necessary for CW's retention of the benefit of leasing activities to be unjust.  "When the record shows the defendant was a passive beneficiary, unjust enrichment has not occurred."  S & J, Inc. v. McLoud & Co., at 769 *citing* Graves, at 64.

It is undisputed that after Meno was appointed Receiver, he hired Woodmont as the Manager of the Properties.   Woodmont offered on-site Ariel employees continued employment with Woodmont.  There is no evidence of any employment contracts breached by these

28

employees in continuing their employment with Woodmont.  The plaintiffs' tortious interference claim was dismissed from this lawsuit; consequently, there is nothing in the evidentiary record to demonstrate that the Receiver or Woodmont engaged in wrongful conduct by offering continued employment to the (former) Ariel employees.  Both the Receiver and Woodmont had a duty to protect the receivership estate, and manage the Properties in a prudent financial manner.  No juror could reasonably find that hiring personnel already on-site and familiar with the management and leasing operation of the Properties was anything less that financially prudent. There is no evidence of wrongful conduct by the defendants in hiring the (former) Ariel employees, who had the choice as to whether or not to continue their employment with the defendants.  Plaintiffs have failed to successfully challenge this issue on summary judgment.

As for the use of the Ariel marks, plaintiff cannot show that the defendants inequitably retained a benefit without just compensation.  It is undisputed that Ariel entered into the Licensing Agreement[11] with CW for the use of the marks upon appointment of the receiver and termination of Ariel as the Manager.  It is undisputed that CW paid Ariel all sums required by the Licensing Agreement.  Thus, Ariel received what it intended to obtain when it entered into the Licensing Agreement.  Furthermore, once the Receiver was appointed, the Receivership Order required continued use of the trade names/trademarks in place regarding the Properties and Ariel was compensated for its "continued cooperation" during the receivership transition period.

Plaintiffs appear to argue that defendants had some type of duty to "debrand" the Properties once the receivership was in place.  They fail to explain the source of this duty they believe the Receiver and Woodmont violated.  The evidence before the Court shows no such duty existed at the time the receivership was in place, and in fact, the Receiver and Woodmont had a fiduciary duty not to incur unnecessary expenses for the Properties.  Since the trade names/trademarks were already in place, and the Receivership Order authorized their continued use, the costs of debranding would be fiscally irresponsible.  Furthermore, the Court fails to see,

---

[11]The fact that Prescott, as the registered owner of the subject trade names/trademarks, did not sign the Licensing Agreement will be addressed later in this memorandum.

and the plaintiffs fail to show, how debranding would have profited  the plaintiffs because the costs of debranding would be borne by other individuals, not the plaintiffs.

The use of the trade names/trademarks by CW and this Receiver was authorized under the Licensing Agreement and/or the Receivership Order and Ariel was paid for said use; thus, the defendants did not engage in any wrongful conduct in benefitted the defendants at the plaintiffs' expense.  No reasonable juror could find any issue of material fact demonstrating that defendants were unjustly enriched by the alleged use of the trade names/trademarks. Defendants are entitled to judgment as a matter of law on Count VI of the plaintiffs' amended complaint.

## Trademark Infringement and Unfair Competition

Plaintiffs contend that the defendants have wrongfully appropriated and used the Ariel marks.  They further contend that the Licensing Agreement  is ineffectual because it was not signed by plaintiff Prescott, and plaintiff Ariel signed it under "economic duress."  They further argue that the Receivership Order only authorizes Meno and Woodmont to "operate the Receivership Property under any existing name or trade name" which doesn't include certain "trade marks."  They further argue that since Prescott was not a party to the receivership proceedings, the Receivership Order does not apply to the Ariel marks since they are owned by Prescott.  Finally, they argue that even if the Licensing Agreement was valid and enforceable, the plaintiffs terminated it as of December 8, 2009, or in the alternative, was only "temporary" and "self-terminated" when the parties failed to successfully negotiate a "new permanent" agreement.

After careful consideration of the matter, the Court finds that there are no material issues of fact in dispute that the defendants were authorized to use all Ariel marks under the Licensing Agreement and the Receivership Order, that defendant CW did not use the subject trade names/trademarks, and that defendants did not engage in any wrongful conduct evidencing willful infringement or actual confusion.

## I. The Licensing Agreement

Plaintiffs contend that the Licensing Agreement is invalid and unenforceable because it was not signed by anyone on behalf of Prescott, the registered owner of the subject trade names/trademarks.  Defendants counter that at all times Ariel's actions provided defendants with

a reasonable belief that Ariel was either authorized to license the Ariel marks or held itself out to be authorized to license the Ariel marks.  Thus, defendants contend that Ariel had apparent authority to sign the Licensing Agreement and bind both plaintiffs to it.

In the absence of actual authority, an agent's acts may be binding upon the principal if performed with apparent authority.

> Apparent authority is created by the conduct of the principal which causes a third person reasonably to believe that another has the authority to act for the principal.  A finding of apparent authority requires evidence that a principal has communicated directly with the third party or has knowingly permitted its agent to exercise authority.  Thus, actual authority is created by the principal's manifestations to the agent, whereas apparent authority is created by the principal's manifestations to a third party.

Blue haven Funding, LLC v. First American Title Ins.Co., 2009 WL 1421207, *8 (E.D.Mo. May 20, 2009) *aff'd* 594 F.3d. 1055 (8th Cir. 2010) *quoting*  Hardcore Concrete, LLC v. Fortner Ins. Services, Inc., 220 S.W.3d. 350, 355 n.4 (internal citation omitted); *see also*, Pitman Place Development, LLC v. Howard Investments, LLC, 330 S.W.3d. 519, 527 (Mo.App. 2010). To establish the apparent authority of an agent, a party must show that: 1) the principal manifested its consent to the exercise of such authority or knowingly permitted the agent to assume the exercise of such authority; 2) the person relying on this exercise of authority knew of the facts and, acting in good faith, had reason to believe, and actually believed, the agent possessed such authority; and 3) the person relying on the appearance of authority changed his position and will be injured or suffer loss if the transaction executed by the agent does not bind the principal.  Blue haven Funding, 2009 WL 1421207, at *8; Pitman Place Development, at 527;  IOS Capital, LLC v. Allied Home Mortgage Capital Corp., 150 S.W.3d. 148, 152 (Mo.App. 2004). The reliance by the third party must be reasonable.  "When a principal has by his voluntary act placed an agent in such a situation that a person of ordinary prudence, conversant with business usages and the nature of the particular business, is justified in presuming that such agent has authority to perform a particular act on behalf of his principal, the principal is estopped, as against such innocent third person, from denying the agent's authority to perform the act." Pitman Place Development, at 527 *quoting* K & G Farms v. Monroe County Service Co., 134 S.W.3d. 40, 43

(Mo.App. 2003). "Typically, `any conduct by the principal which, if reasonably interpreted, would cause a third person to believe that the principal consents to the acts of the agent is sufficient to create apparent authority.'" Pitman Place Development, at 527 *quoting* Lynch v. Helm Plumbing and Elec. Contractors, Inc., 108 S.W.3d 657, 660 (Mo.App. 2002). Once apparent authority is established, such authority is the equivalent of expressly conferred authority as to third parties, and if relied upon by an innocent third party, the principal is estopped to deny the agent's authority. Pitmann Place Development, at 527 (citations omitted).

In the instant case, plaintiffs have not denied in any manner that Ariel had the permission of Prescott to use the subject marks in connection with the marketing and leasing activities associated with the Assets. Stupin was a principal of Prescott and Ariel. In fact, in her affidavit she attests that although Prescott was the registered owner, the use of the subject marks enabled Ariel to compete for tenants and retail customers with other outlet mall competitors and that "Ariel erected trademarked signage at the Borrowers outlet centers, and used the logos and trademarks extensively on highway billboards, signs, print advertising, mailers, and promotional items." Plaintiffs' Exhibit [71-4], Stupin Affidavit, ¶12. Stupin went so far as to attest that, although she knew removal of the trademarks would be disruptive to the operation of the Properties, she believed that such removal was necessary because "Ariel had no choice **to protect its Trademarks.**" Plaintiffs' Exhibit [71-4], Stupin Affidavit, ¶35.

Gamble was a principal of Prescott and Ariel. Both he and Stupin reviewed the drafts of the Licensing Agreement and never once made any changes to the signature lines by either eliminating the signature line for Ariel or substituting or adding a signature line for Prescott. Prior to Gamble signing the Licensing Agreement on behalf of Ariel only, said agreement was reviewed by Stupin's counsel, and she failed to inform her counsel of the need to add or substitute Prescott as a signatory to the agreement. Finally, even Gamble was confused as to held the authority to license the trademarks, believing at one point Prescott owned the trademarks, then at another time believing Ariel owned the trademarks. Defendants' Exhibit [61-3/B], pgs.

62-66.  However, at the time he signed the Licensing Agreement, he believed that Ariel was authorized to license the "Ariel trademarks."  Defendants' Exhibit [61-3/B], pg. 66.

No reasonable juror could find that Ariel did not have apparent authority to enter into the Licensing Agreement on behalf of itself and Prescott, that the defendants reasonably relied on this apparent authority to enter into the Licensing Agreement, and that Prescott is estopped from denying Ariel's authority to enter into the Licensing Agreement.  As such, the Licensing Agreement is binding and enforceable as to both plaintiffs.

Plaintiffs next contend that the Licensing Agreement is invalid and unenforceable because the Ariel signed it under "economic duress."  Plaintiffs contend that CW knew of the plaintiffs' weaken financial condition and took advantage of it to "force" Ariel to sign the agreement.  Whether particular facts are sufficient to constitute duress is a question of law for the court.  Gustin v. FDIC, as Receiver for The Merchants Bank, et. al., 835 F.Supp. 503, 508 (W.D.Mo. 1993) *citing* Schmalz v. Hardy Salt Co., 739 S.W.2d. 765, 768 (Mo.App. 1987).

A party claiming duress must demonstrate that the party was so oppressed from the wrongful conduct of the other another party as to deprive it of free will.  Gustin, at 508 *citing* Schmalz, at 768; Oliver v. Resolution Trust Corp., Receiver of Sooner Federal Savings and Loan Assoc., et. al., 747 F.Supp. 1351, 1356 (E.D.Mo. 1990)(*citing* Schmalz, *supra.*); Long's Marine, Inc. v. Boyland, 899 S.W.2d. 945, , 947 (Mo.App. 1995)(*citing* Schmalz, *supra.*).  "It is not duress to do, or to threaten to do, what one has a right to do."  Gustin, at 508.  One party's knowledge of another party's financial pressures is irrelevant as to the question of duress because the financial necessity of a party, not caused by the other contracting party, does not constitute duress.  Oliver, at 1356 *citing* Schmalz, at 768; Long's Marine, at 947 *citing* Schmalz, *supra.*

Furthermore, "courts have recognized that where an experienced businessman takes sufficient time, seeks the advice of counsel, and understands the content of what he is signing, he cannot claim the execution of the instrument was the product of duress."  Gustin, at 508 *citing* Schmalz, at 768; *see also*, Long's Marine, at 947 (economic duress not found where plaintiff was an experienced businessman and had counsel draft and review documents and aware of negotiations prior to entering into disputed business transaction).

Plaintiffs have admitted that their financial stress was due to a downturn in the economy in 2008-09.  They admit that this "world-wide economic downturn" contributed to their financial stress due to tenant closings and bankruptcies creating vacancies and reduced income at the Properties.  They further admit that this financial stress resulting from the economic recession contributed to the Borrower defaulting on the loan in April 2009.  By the plaintiffs' own admission, none of the defendants did anything to cause the plaintiff's financial stress prior to June 2009 when CW became the Special Servicer and began attempts to restructure the loan. Furthermore, CW paid Ariel in July its June management fees, and then again in August for the Licensing Agreement.   Plaintiffs contend that defendants knowledge of the plaintiffs' financial stress enabled it to create a situation of economic duress under which Ariel signed the Licensing Agreement.  This contention is meritless because the defendants' knowledge of the plaintiffs' economic pressures is irrelevant since it had done nothing to create the economic pressures that the plaintiffs faced in August 2009.  The fact that the plaintiffs believed that it needed a certain level of financial support from the defendants to survive fails to support a claim of economic duress.  The evidence before the Court shows that the plaintiffs' financial position as of the summer of 2009 was due to the world-wide recession and the plaintiffs' own poor business decisions.

Furthermore, the defendants had every right to terminate Ariel's management services once the loan went into default.  Even if plaintiffs felt that this specter of termination was a "threat," the fact still remains that CW was not obligated to retain Ariel as the Manager and was not obligated to pay Ariel under the terms of the Management Agreement between Ariel and the Borrower.  CW did not engage in any wrongful conduct by pointing out to Ariel that it had the right to terminate Ariel as Manager and that it could choose not to do so under certain conditions; i.e. the parties entering into the Licensing Agreement.  CW agreed to pay Ariel $260,000.00 in exchange for a signed trademark license and to cover prior management services provided by Ariel, and to negotiate with Ariel for a subsequent license.  Ariel agreed to license its trademarks to the Lender, Borrower, or any duly-appointed receiver upon termination of Ariel's management services. The payments were made and the parties negotiated, albeit unsuccessfully, on a

34

subsequent licensing agreement. The evidence shows that Ariel executed the Licensing Agreement due to financial necessity and that the defendants had nothing to do with the financial difficulties that the plaintiffs faced during the summer of 2009, especially at the time of the signing of the License Agreement.

Finally, a claim of economic duress requires the plaintiffs to show that they were so oppressed, by the wrongful conduct of the defendants, that they were deprived of their free will. As already determined, the defendants did not engage in any wrongful conduct in the execution of the Licensing Agreement.  Gamble and Stupin are experienced businesspeople.   Stupin reviewed several drafts of the Licensing Agreement, and had her attorney review same.  Gamble signed the Licensing Agreement with a full understanding of its terms.  Ariel was free to choose not to sign the Licensing Agreement.  It chose to sign it and may have done so under a financial necessity, but again, the financial necessity was not created by the defendants.  Even if CW was aware of the plaintiffs' financial stress, and used it "to its advantage" by presenting the plaintiffs with a licensing agreement under a "threat" of termination of Ariel's management services, none of this constitutes actionable wrongful conduct on CW's part.  *See*, Long's Marine, at 947 (no wrongful conduct creating economic duress by the defendants' alleged acts of violating the plaintiff's trust, laughing at the plaintiff's financial crisis, and planning to "tighten the screws" against the plaintiff).

Plaintiffs next contend that even if the Licensing Agreement was valid and enforceable, it was terminated by the plaintiffs via an e-mail dated December 8, 2009.  Plaintiffs' Exhibit [71-38].  This email sent by Elizabeth Karmin (Prescott's counsel) to Marv Ehrlich (CW's counsel) states in pertinent part:

> Mark **[sic]**: As I mentioned to you in our discussion yesterday, The Prescott Group (which is the owner of Ariel Preferred Retail Group) has not consented to any continued use by the Borrowers of the trademarks owned by Ariel Preferred Retail Group.[12] To the extent you have any argument that such consent was given by any course of dealing, then this message shall constitute notice that

---

[12]The Court notes that even the plaintiffs' own counsel believed that the trademarks were owned by plaintiff Ariel.

> such consent was never intended to be given and is hereby
> withdrawn and terminated.

This exhibit fails to show that the plaintiffs had terminated the Licensing Agreement.  All this email shows is that the Prescott had not consented to the continued use of the Ariel trademarks by **the Borrower**.  Nowhere is CW or any of the defendants even mentioned..  There is no reference at all to the Licensing Agreement entered into between CW and Ariel.  Furthermore, the remainder of the email only speaks to Prescott's belief that the Receivership Order fails to give the Receiver or anyone else the right to use the marks because the Borrower does not own them; and that Prescott is providing a draft of a revised Licensing Agreement for CW's consideration.  To the extent that this email evidences the withdrawal and/or termination of anything, it is clear that it only withdraws and/or terminates Prescott's consent for **the Borrower's continued use of the trademarks.**

Plaintiffs contend that they had the right to unilaterally terminate the Licensing Agreement because it had no end date "and so the owner of the trademark had the authority to terminate the agreement on reasonable notice."  Plaintiffs' Surreply [89], pg. 3.  Plaintiffs fail to cite any legal authority for this proposition.  It is simply their legal conclusion without any support.

However, under Missouri law, one party to a valid bilateral contract may not unilaterally alter its terms.  Any modification of the written Licensing Agreement, including termination of same and replacement with a new contract, required the mutual assent of the parties.  Stephenson v. Village of Claycomo, at 27.  The plaintiffs could not unilaterally terminate the Licensing Agreement simply because they wanted to enter into a new contract which they considered more advantageous to them.  *See*, Stephenson, at 28 (defendant employer could not unilaterally terminate plaintiff's employment contract because it wanted him to enter into a new contract it considered "more reasonable").

36

The plaintiffs allege violations pursuant to the Lanham Act, 15 U.S.C. §§1114 and 1125, as well as common law infringement.[13]   Trademark infringement and false designation of origin claims both require the trademark owner to prove that it has ownership or rights in the trademark and that the defendant **has used the mark in connection with goods or services in a manner likely to cause consumer confusion as to the source or sponsorship of the goods or services.** Community of Christ Copyright Corp, at 1009 (emphasis added).  The Lanham Act imposes civil liability on "any person . . . without consent of the registrant . . . use[s] in commerce any reproduction . . . or colorable imitation of a registered mark."  15 U.S.C. §114(1)(a).  Section 43 of the Act also imposes liability for "[a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof . . . which . . . is likely to cause confusion . . . as to the origin, sponsorship, or approval of goods, services, or commercial activities."  15 U.S.C. §1125(a)(1)(A).  Section 45 of the Lanham Act, which defines when a servicemark is being "used in commerce" states in pertinent part:

> "The term `use in commerce' means the bona fide use of a mark in the ordinary course of trade, and not merely to reserve a right in a mark.  For purposes of this Chapter, a mark shall be deemed to be in use in commerce . . . on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce . . ."

15 U.S.C. §1127(2).

CW contends that it has never used in commerce the Ariel marks.  As Special Servicer, CW's primary role was to financially protect the Assets once the Borrower had defaulted on the Loan. It took financial control of the Assets and worked with loan servicers and loan trustees, potential creditors, and the Borrower, to evaluate options an potential restructuring of the financial backing of the Assets. As Special Servicer, CW primary responsibility was to stabilize the financial status of the Properties.  It wasn't in the business of the managing of the Properties.

---

[13]Under Missouri law, it is well-settled that the same set of facts which support a suit for federal trademark infringement and unfair competition support similar infringement claims under Missouri law and common law.  See, Community of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church, 634 F.3d. 1005, 1010 (8th Cir. 2011).

In fact, during the period that CW was acting as Special Servicer and up to the time Meno was appointed Receiver and Woodmont took over management of the Properties, Ariel was managing the Properties.  CW contends that Ariel managed the Properties under the Ariel trademarks until the Receiver was appointed.

The plaintiffs appear to contend that CW (as well as Meno and Woodmont) "used in commerce" the Ariel marks because they never "debranded" the Properties during the relevant time-period.  They argue that the "motivation to use the Trademarks (and their actual use) included the cost of having to remove them, so Defendants intentionally used them in commerce." Plaintiffs' Memorandum in Opposition [68], pg. 26.  They further offer Exhibits 44 and 56 as evidence of CW's "use in commerce" of the Ariel marks.

The plaintiffs' argument is meritless.  Firstly, it is undisputed that during the period when CW was acting as Special Servicer for the Properties, Ariel was managing the Properties under the Ariel marks.  The plaintiffs have set forth no evidence that CW took any action in managing or leasing the Properties.  Secondly, Exhibit 44 are screenshots of the Properties as listed **on Woodmont's website**.  There is no indication whatsoever of any connection to CW.  In fact, one of the screenshots, the Asset located in Darien, Georgia, proclaims in large letters "RECEIVER AUTHORIZED SALE."  Thirdly, Exhibit 56 again appears to be screenshots but of this time of CW's website.  Exhibit 56 shows a listing and photos of the Assets put up for sale.  None of the screenshots shows any Ariel mark or mentions in any way either one of the plaintiffs. Furthermore, the plaintiffs themselves admit that as Special Servicer, CW "must act to maximize the recovery on the mortgage loan to the bondholders (as a collective whole) based on an analysis of work-out alternatives using a net present value methodology." Plaintiffs' Memorandum in Opposition [68], pg. 5.  In maximizing the recovery on the mortgage loan, plaintiffs list several "options" open to a special servicer.  "The options range from negotiating a loan modification, sale of the loan, foreclosure and liquidations.  The special servicer may also hold and stabilize the properties, **sell them**, or take such other actions allowed by special servicing standards to

improve the properties to enhance values, extend terms, or work a voluntary or involuntary receivership."  Plaintiffs Memorandum in Opposition [68], pgs. 5-6.

All the plaintiffs have shown is that Woodmont listed the Properties for sale under the authority of the Receivership Order; and prior to that, CW listed the Properties for sale under the standards of special servicing.  Neither of the exhibits shows any Ariel marks, makes any mention of Ariel or Prescott, or indicates any act taken by CW to "use in commerce" the Ariel marks.

The Licensing Agreement authorized CW and any duly-appointed receiver to use Ariel's marks upon the termination of Ariel as Manager of the Properties.  Ariel, as Manager of the Properties, was terminated on December 16, 2009.  At that time, Meno was appointed Receiver and Woodmont was hired by the Receiver to manage the Properties.  Pursuant to the Licensing Agreement and the Receivership Order, Meno and Woodmont were authorized to operate and manage the Properties under the current Ariel marks.

Lastly, it appears that the plaintiffs contend that the Licensing Agreement should be held invalid and unenforceable because CW and the plaintiffs failed to negotiate a new licensing agreement.  This argument is meritless

In consideration of the plaintiffs entering into the Licensing Agreement, CW agreed to pay Ariel $260,000.00 and to negotiate a new licensing agreement.  The evidence before the Court shows that CW made the $260,000.00 payment to Ariel, and that parties did spend considerable time negotiating a new licensing agreement, albeit unsuccessfully.  No reasonable juror could find otherwise.

Furthermore, essentially the plaintiffs are attempting to sue on a "promise" to enter into a new contract; i.e. a claim for promissory estoppel. Plaintiffs' amended complaint fails to make any claim for promissory estoppel. *Assuming arguendo*, that such a claim is present in this case, plaintiffs still have failed to successfully prove such a claim as a matter of law.

Under Missouri law, a claim for promissory estoppel allows the courts to enforce a promise on equitable grounds even if the parties have not entered into a contract.  The 1861 Group, LLC v. Wild Oats Markets, Inc., 728 F.Supp.2d. 1052, 1059 (E.D.Mo. 2010)(*citing* City

of St. Joseph v. SW Bell Tel., 439 F.3d. 468, 477 (8th Cir. 2006).  Promissory estoppel requires: 1) a promise; 2) on which a party relies to his or her detriment; 3) in a way the promisor expected or should have expected; and 4) resulting in an injustice that only enforcement of the promise could cure.  The 1861 Group, at 1059; Clevenger v. Oliver Ins. Agency, 237 S.W.3d. 588, 590 (Mo. 2007); Glenn, MD, et. al. v. Healthlink HMO, Inc., et. al., 360 S.W.3d. 866, 877 (Mo.App. 2012). "In Missouri, promissory estoppel is not a favorite of the law, and each element must clearly appear and by proven by the party seeking its enforcement."  Glenn, MD., at 877 *quoting* Clevenger, at 590.  The doctrine of promissory estoppel should applied "with caution, sparingly, and only in extreme cases to avoid unjust results."  The 1861 Group, at 1059 *quoting*  City of St. Joseph, at 477.

The promise giving rise to the claim for promissory estoppel must by definite and the promise must be made in a contractual sense.  Clevenger, at 590 (citation omitted).  Finally, under Missouri law, "the promise element cannot be based on preliminary negotiations and discussions or an agreement to negotiate the terms of a future contract."  The 1861 Group, at 1059-60 *citing* Prenger v. Baumhoer, 939 S.W.2d. 23, 27 (MoApp. 1997).

In the instant case, the undisputed record shows that all CW did was promise to negotiate terms of a future licensing agreement, Thus, a claim for promissory estoppel cannot survive. Furthermore, the evidence before the Court shows that CW did do what it promised, i.e. engage in negotiations for a future licensing agreement.  The fact that one was not created to the plaintiffs' liking is simply irrelevant.

The Licensing Agreement was a valid and enforceable agreement that provided a license to CW and any receiver the right to use the Ariel marks upon Ariel's termination of it management duties.  There is no evidence upon which any reasonable juror could find that CW, at any time, "used in commerce" the Ariel marks.  Furthermore, no reasonable juror could find that upon Ariel's termination as the Manager, the Licensing Agreement did not give Meno (and Woodmont, as the Receiver's agent) use of the Ariel marks.

**II. The Receivership Order**

The defendants do not deny that Meno and Woodmont used the Ariel marks; however, they vigorously argue that such use does not constitute willful infringement because they were authorized to use same under the Receivership Order.  Plaintiffs contend that the Receivership Order does not apply to them because they were not parties to it.  They further contend that if the Receivership Order is enforceable against them, it only permits the defendants to use the "existing name or trade name" which does not include certain "trade marks" including but not limited to "the ribbon design logo."

It is undisputed that on December 11, 2009 the Superior Court of Gwinnett County, State of Georgia signed the Receivership Order, appointing defendant Meno as the Receiver for the receivership estate composing of the Properties.  In turn, Meno, as Receiver, terminated Ariel as Manager and hired defendant Woodmont as Manager of the Properties.

There also is no dispute that neither Prescott nor Ariel were a party to the Receivership Order.  Arguably, they were bound by the Order nonetheless due to their participation in the negotiations that led to the Order and the fact of their interrelationships with the Borrower.  In that regard, the Receivership Order was negotiated among the Lender, CW, and the Borrower FVRH.  In addition, Prescott is the parent of its affiliate Ariel, and Prescott is the General Partner of FVRH, and holds a minority interest in FVRH.  And further, the Order required payments to be made to Ariel which were indeed made and accepted by Ariel.  However, this Court need not determine whether plaintiffs were bound by the Receivership Order because they most certainly were bound by the Trademark Licensing Agreement which expressly gave the Receiver the authority to use plaintiffs' marks.

Plaintiffs next contend that even if the Receivership Order is enforceable against them, it only grants the defendants the authority to use the Ariel "trade names" and not the Ariel "trademarks" especially the "ribbon design logo."  The Trademark Licensing Agreement, however, provides for "...any receiver[...] to use the name 'Ariel Preferred Retail Group LLC' or any reasonable deviation thereof in the operations and management of the various properties...."  This language is broad enough to encompass the Ariel name as well as the "ribbon design logo," which, by plaintiffs' own evidence, is used in conjunction with its name to distinguish it from

41

competitors.  Furthermore, this conclusion is consistent with the Lanham Act's definition of the term, "trademark," which includes "any word, name, symbol or device, or any combination thereof...to identify and distinguish his or her goods...." 15 U.S.C. § 1172.

Accordingly, the Court determines, and no reasonable juror could find otherwise, that the Trademark Licensing Agreement authorized the Receiver (and his agents) to use the Ariel trade name and trademarks/logo.

## III. Willful Infringement and Unfair Competition/False Designation

It is not entirely clear what the underlying theory is regarding the plaintiffs' trademark infringement claims; however, it appears that they contend that the defendants used the trade names/trademarks with the intent to put the plaintiffs out of business and to confuse consumers as to the management of the Properties. They further claim that the defendants' conduct was so oppressive as to entitle the plaintiffs to attorneys' fees.

To prove a trademark infringement claim, a plaintiff must show that it has a valid, protectible mark and there is a likelihood of confusion between its mark and the defendant's mark.[14]  Defendants do not deny use of the subject trade name and/or trademarks but instead contend that 1) they had actual authority to use same pursuant to the Licensing Agreement and the Receivership Order; 2) they had a good faith belief that they had authority to use same pursuant to the Licensing Agreement and the Receivership Order; and 3) the plaintiffs have failed to prove either "likelihood of confusion" or "actual confusion" by any identified consumer; and 4) that the plaintiffs have failed to prove "actual confusion" which is a prerequisite to the recovery of money damages, including attorneys' fees.

---

[14]The Court notes that this is not a typical trademark infringement case wherein the plaintiff contends that the defendant's trademark is infringing upon the plaintiff's trademark because the defendant's trademark is "likely to confuse" consumers into believing that the defendant's product/service is the same as the plaintiff's product/service.  However, for purposes of the instant motion, standard pronouncements of trademark law are applicable to the present case although it does not involve competing trademarks.

Normally, a court considers six (6) factors to determine whether there is a likelihood of confusion:[15] 1) the strength of the trademark owner's mark; 2) the similarity between the trademark owner's mark and the alleged infringer's mark; 3) the degree to which the products compete with each other; 4) the alleged infringer's intent to confuse the public; 5) the degree of care reasonably expected of potential customers; and 6) evidence of actual confusion. Community of Christ Copyright Corp., at 2009; Sensient Technologies, at 763. No individual factor controls because the "inquiry is inherently case-specific, different factors may be entitled to more weight in different cases." Community of Christ Copyright Corp, at 2009 *quoting* Kemp v. Bumble Bee Seafoods, Inc., 398 F.3d. 1049, 1053 (8th Cir. 2005)(internal citation omitted). In the instant matter, the elements of the defendants' "intent to confuse the public" and whether the plaintiffs have produced evidence of "actual confusion" are paramount to the Court's inquiry in the summary judgment stage as to whether a reasonable jury could find a likelihood of confusion. *See*, Sensient Technologies, at 763.

In an action for trademark infringement, a viable defense is that the alleged infringer's use of the trademark is within the scope of the trademark owner's consent as manifested in an agreement between the parties or by other conduct from which the owner's consent can be reasonably inferred. *See*, **Restatement Third**: Unfair Competition §29. Where the alleged infringer has authorized use for the mark, there can be no likelihood of confusion and no violation if the alleged infringer uses the mark as authorized. Segal v. Geisha NYC LLC , 517 F.3d. 501, 505-06 (7th Cir. 2008); The B & F System, Inc. v. LeBlanc, 2011 WL 4103576, *17 (M.D.Ga. Sept. 15, 2011)(*citing* Segal v. Geisha NYC LLC, *supra*).

In the instant case, both the Licensing Agreement and the Receivership Order authorized the defendants to use the subject trade name and trademarks/logo. Furthermore, there is no evidence before the Court upon which any reasonable juror could conclude that the defendants

---

[15]The plaintiffs must show a likelihood of confusion as part of its Lanham Act claims, its common law trademark infringement and unfair competition claim, and its Missouri statutory trademark infringement claims. Sensient Technologies Corp. v. SensoryEffects Flavor Co., 613 F.3d. 754, 763, n.3 (8th Cir. 2010).

did not have a good faith belief that they had authorization to use Ariel's trade name and trademarks/logo. All the plaintiffs have put forth is evidence which they believe casts the defendants is a negative light; i.e. that CW failed to restructure the defaulted loan, that CW and/or the Receiver believed that Woodmont would be a more cost-effective manager for the Properties, and the defendants "unwillingness" to debrand the Properties and/or provide the plaintiffs with such debranding costs during discovery.  None of this "evidence" is relevant to whether the defendants had actual authorization or a good-faith belief they had authorization to use the Ariel marks pursuant to the Licensing Agreement and the Receivership Order.

Furthermore, the plaintiffs have failed to sufficiently show that the defendants intended to use the Ariel marks to confuse the public.  Plaintiffs contend that the defendants wanted the Ariel marks in order to profit from the "good name" and well-established business of Ariel, especially since Woodmont was a competitor in the retail outlet mall real estate business.  "Knowledge of another's product and an intent to compete with that product is not, however, equivalent to an intent by a new entrant to a market to mislead and to cause consumer confusion."  General Mills, Inc. v. Kellogg Co., 824 F.2d. 622, 627 (8th Cir. 1987); *see*, Luigino's v. Souffer Corp., 170 F.3d. 817, 831 (*citing* General Mills, *supra*.).

Again, the defendants do not deny using the Ariel marks, but "not all use of a trademark constitutes infringement."  Teter v. Glass Onion, Inc., 723 F.Supp.2d. 1138, 1156 (W.D.Mo. 2010).  The defendants not only had authorization to use the trademarks but believed that continued use of the Ariel marks was in the best interest of the Properties - a fact recognized by the Receivership Order.  Furthermore, on December 17, 2009 Woodmont hand delivered and delivered by certified mail to all tenants of the Properties a notice informing them of the receivership, the appointment of Meno as the Receiver, and the hiring by the Receiver of Woodmont as the new Manager of the Properties.  It specifically names all personnel involved with the operation, management, and leasing of the Properties.  The notice further informs the tenants Woodmont will continue to office on-site at each of the Properties and that rent payments should continue to be made at the address listed for the particular Property.  Defendants' Exhibit

44

[79-1].[16]  Thus, the Ariel mark was used to merely identify the Properties, and the defendants took steps to inform the tenants of the Properties of the change in management.  The defendants did not possess an intent to confuse the public.  *See*, Teter, at 1156.

Furthermore, the plaintiffs have failed to provide evidence of either "likelihood of confusion" or "actual confusion."  Although traditionally cases (within the Eighth Circuit) interpreting the Lanham Act have required evidence of "likelihood of confusion" for injunctive relief, and evidence of "actual confusion" for monetary damages, the Eighth Circuit has recently determined that there is no "bright-line rule" requiring evidence of "actual confusion" as prerequisite for money damages.  Masters v. UHS of Delaware, Inc., 631 F.3d. 464, 472 (8th Cir. 2011).  Even so, the plaintiffs evidence falls way short of either "likelihood of confusion" or "actual confusion."

Plaintiffs contend that vendors and creditors approached Ariel to seek collection for management and/or leasing services rendered as a result of consumer confusion.  In support of this argument, they have submitted three (3) exhibits: 46, 47, and 48.  Exhibit 46 is an invoice sent to Ariel from Spurrier Media Group for radio promotional services provided in July and August 2009, shortly after the defaulted loan went into special serving and prior to Ariel's termination as Manager upon Meno's appointment as Receiver.  Exhibit 47 is a letter dated February 5, 2010 sent from the Viad Corporation to Don Chapman at Ariel regarding services at trade show.  The exhibit is incomplete and fails to note when these services had been provided.  Exhibit 48 is a letter dated November 5, 2009 from the Flateman Law Firm to Jim DeAngelo of CW relating to leasing services provided to Ariel.

These exhibits fails to demonstrate in any manner that the vendors were confused by the defendants' use of the Ariel marks.  There is no connection between the substance of these exhibits and use of the Ariel marks.  Furthermore, the services noted in these exhibits were provided prior to the time the Receiver was appointed and Woodmont was hired as the new

---

[16]This particular exhibit evidences the notice sent to the Darien, GA Property; however, the same type of notice was sent to each of the Properties subject to the Receivership Order.

Manager.  At the time the services were rendered, as noted in these exhibits,[17] Ariel was the Manager of the Properties and providing management services for which it was paid, and had been informed by CW that it would not be compensated for leasing activities past mid-August 2009.

More significantly is that the plaintiffs have failed to produce sufficient evidence of actual confusion to successfully challenge the defendants' summary judgment motion.  Granted that in this case wherein the dispute is not over competing marks but whether use of the owner's mark by the alleged infringer was lawful, extrinsic proof of actual confusion may be difficult. *See*, Masters v. UHS of Delaware, Inc., at 473.  However, in the instant case evidence of actual confusion is significantly lacking.  Ms. Stupin, in her affidavit, provides the only testimony by someone intimately involved in the events giving rise this lawsuit.

In her affidavit, Ms. Stupin attests that:

> In October and November Ariel faced increasing demands from creditors of the Borrowers for outstanding invoices for services provided.  CW was not paying all the vendors who had provided services, and in some cases directing them to Ariel.

Plaintiffs' Exhibit [71-4], ¶32.  Firstly, in October and November 2009, Ariel was still managing the Properties, so creditors approaching Ariel would not have been out of the ordinary and fails to evidence actual confusion caused by the defendants' alleged use of the Ariel marks.  Also, it is unclear whether these creditors were seeking payment for services previously performed and possibly prior to the time the defaulted loan went into special servicing.

Secondly, Ms. Stupin refers to **creditors of the Borrowers**.  While the defaulted loan was in special servicing, CW would have been handling the financial aspects of the Borrower, including the resolution of outstanding debts, the fact that these creditors may have been seeking reimbursement from Ariel, the Manager of the Properties at that time, still fails to show actual confusion by these creditors due to the defendants' alleged use of the Ariel marks.

---

[17]Since Exhibit 47 is incomplete, the Court can only presume the services noted were provided prior to the appointment of the Receiver.

Finally, at best, the Court presumes that there may have been some minimal, confusion once there was a change from Ariel to Woodmont as Manager of the Properties, the plaintiffs' evidence fails to show any intent to cause confusion, and certainly no real instances of actual confusion.  Even several isolated incidents of actual confusion that occur initially when such a change in management occurs, and even if the Ariel marks remain in place, are insufficient to establish a genuine issue of material fact as the likelihood of confusion.  *See*, Sensient Technologies Corp., at 768 (citation omitted).  Here, plaintiffs have offered only evidence of negligible confusion and  not an "appreciable number of ordinary purchasers [that] are likely to be so misled" by the alleged use of the Ariel marks by the defendants.  Sensient Technologies Corp., at 768.

Thus, the plaintiffs have failed to provide sufficient evidence of the likelihood of confusion and/or actual confusion to establish a genuine issue of material fact as to its claims of trademark infringement, false designation and unfair competition, and common law and Missouri trademark infringement.  Defendants are entitled to judgment as a matter of law on Counts I, II, III, IV, and VIII.

Dated this 1st day of August, 2012.

_____

UNITED STATES DISTRICT JUDGE